UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ANA L. PEGUERO,                          :

                      Plaintiff,    :    15 Civ. 4714 (GBD)(HBP)

     -against-                      :    REPORT AND
                                         RECOMMENDATION
COMMISSIONER OF SOCIAL SECURITY,    :

                      Defendant.    :

----------------------------------X

          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE GEORGE B. DANIELS, United States

District Judge,


I.  Introduction


          Plaintiff brings this action pursuant to section 205(g)

of the Social Security Act (the "Act"), 42 U.S.C. § 405(g),

seeking judicial review of a final decision of the Commissioner

of Social Security ("Commissioner") denying her application for

supplemental security income ("SSI") and disability insurance

benefits ("DIB").  The Commissioner has moved for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure (Docket Item ("D.I.") 15).  For the reasons set forth

below, I respectfully recommend that the Commissioner's motion be

granted and that the complaint be dismissed.

II.   <u>Facts</u>[1]

    A.   <u>Procedural Background</u>

         Plaintiff alleged in applications for SSI and DIB that she became disabled on February 14, 2008 due to anxiety, emotional stress and post-traumatic stress disorder ("PTSD")[2] (Tr. 91, 273, 280)).   The claims were initially denied by SSA on May 14, 2009 (Tr. 107-113).   Plaintiff requested a hearing, and an Administrative Law Judge ("ALJ") conducted a video hearing on October 21, 2010 during which plaintiff testified on her own behalf (Tr. 116-54, 804-16).   On November 24, 2010, the ALJ issued a decision finding that plaintiff was not disabled (Tr. 91-100).

         Plaintiff sought review before the Appeals Council, which vacated the ALJ's decision and remanded the matter (Tr. 104-06).   The Appeals Council found that the ALJ's decision at step five that plaintiff could perform her past relevant work as

---

[1] I recite only those facts relevant to my review.   The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (<u>See</u> Notice of Filing of Administrative Record, dated August 17, 2015 (Docket Item 13) ("Tr.")) more fully sets out plaintiff's medical history.

[2] PTSD refers to "an anxiety disorder caused by exposure to an intensely traumatic event."   <u>Dorland's Illustrated Medical Dictionary</u>, ("<u>Dorland's</u>") at 552 (32nd ed. 2012).

a telemarketer (a semi-skilled job) was erroneous because the ALJ found that plaintiff only had the residual functional capacity to perform unskilled work (Tr. 105).  The Appeals Council directed the ALJ to further evaluate plaintiff's past relevant work and to obtain vocational evidence from an expert (Tr. 105-06).

Plaintiff attended a second hearing on April 10, 2013 during which she testified through a Spanish interpreter and was accompanied by a non-attorney representative (Tr. 18, 38-81).  On February 28, 2014, ALJ Dina R. Loewy issued a decision finding that plaintiff had not been under a disability within the meaning of the Social Security Act from February 14, 2008 through the date of the decision (Tr. 18-32).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on April 22, 2015 (Tr. 1-3).

The Commissioner filed the present motion on December 18, 2015 (D.I. 15).  There was no response of any kind from plaintiff.  Accordingly, on May 27, 2016, I issued an Order <u>mea sponte</u> giving plaintiff until June 27, 2016 to submit any opposition (D.I. 18).[3]  My staff mailed a copy of this Order

---

[3]My May 27 Order provided:

By notice of motion dated [December 18, 2015] (Docket Item 15), the Commissioner of Social Security has submitted a motion for judgment on the pleadings.
(continued...)

to plaintiff; it has not been returned as undeliverable.  Plain-
tiff has not submitted any opposition to the Commissioner's
motion nor has she contacted my chambers in any way.

    B.  <u>Social Background</u>

      Plaintiff was born in May 1977 and was thirty-one at
the time of her application (Tr. 273).  She completed the twelfth
grade in the Dominican Republic and earned a GED in the U.S. (Tr.
48-49, 644).  She had past work as a food service worker, an
education consultant and a telemarketer (Tr. 49-50).  Plaintiff
reported to SSA that she stopped working because in February 2008
she "had a problem with domestic violence and [she] was stabbed

---

<sup>3</sup>(...continued)
    To date, plaintiff has not served or filed any opposi-
    tion to the motion, nor has she requested an extension
    of time within which to serve opposition papers.

      Although I shall consider the merits of the Com-
    missioner's motion and shall not grant the motion on
    default, plaintiff's failure to submit any opposition
    to the motion for judgment on the pleadings makes it
    substantially more likely that the motion will be
    granted.  Thus, plaintiff's failure to oppose the
    motion increases the likelihood that her complaint will
    be dismissed, and that the Social Security Administra-
    tion's decision denying her benefits will be affirmed.

      Accordingly, if plaintiff wishes to submit any
    opposition to the Commissioner's pending motion, she is
    directed to submit such papers no later than June 27,
    2016.  In the absence of a request for an extension of
    time, I shall consider the motion fully submitted as of
    that date and ready for decision.

by [her] husband.  And the physical conditions that he left [her] in were not good at all.  [She] could not leave [her] house to go to work because [she] was afraid that he would return and kill [her]" (Tr. 309, 811).  As a result of the attack, plaintiff's husband was incarcerated and plaintiff received an order of protection against him (Tr. 421-22, 459, 525).  As of August 2008, plaintiff's husband had been released from prison (Tr. 539).

On March 11, 2009, plaintiff completed a function report in which she reported that she lived alone in an apart-ment, that she had trouble sleeping and that she took sleep medication (Tr. 347-48).  Plaintiff reported difficulty concen-trating and getting along with authority figures when they required "to[o] much time with them," but that she could follow spoken and written instructions (Tr. 353-54).  She reported no difficulty attending to her personal care and did not need reminders to attend to her personal care or take her medication (Tr. 348-49).  A friend cooked for her and helped her do laundry and grocery shop (349-52).  Plaintiff otherwise left home only to attend appointments because she was afraid to go out alone (Tr. 350).  Plaintiff could pay bills, handle a savings account, use a checkbook and count change (Tr. 351).  She watched television as a hobby (Tr. 351).

C.   Medical Background

   1.   Mental Health Treatment

      a.   Treatment Records from Bronx-Lebanon Hospital

      Plaintiff received psychiatric treatment on a monthly
basis at Bronx-Lebanon Hospital after the domestic violence
incident with her husband in February 2008 (Tr. 595-96).[4]  In a
treatment note dated July 10, 2008, psychiatrist Dr. Henry Rochel
noted that plaintiff was referred to him by a social worker from
the District Attorney's Crime Victim's unit (Tr. 537).  Plaintiff
reported that she felt worried, suffered from anxiety, nightmares
and poor appetite and was anxious and depressed (Tr. 537).  The
doctor assessed plaintiff's thought processes as goal-directed
and coherent (Tr. 538).  On September 9, 2008, Dr. Rochel noted
that plaintiff reported that she had heard from her ex-husband
but was feeling better with good sleep and good appetite (Tr.
540).  Dr. Rochel found that plaintiff was stable and coopera-
tive, that her mood was anxious, her affect was appropriate and

_____

      [4]The record is inconsistent as to whether plaintiff received
psychiatric treatment at Bronx-Lebanon before 2008 (See Tr. 423,
596 (stating that plaintiff began treatment in 2005), Tr. 595
(stating plaintiff began treatment in July 2008), Tr. 679
(indicating plaintiff began treatment in 2007)).

her thought process remained coherent and goal-directed (Tr. 540).  On October 14, 2008, Dr. Rochel noted that plaintiff called him to request that her bi-weekly visits be reduced to monthly visits because she was "feeling more stable on her anxiety" and "feels more safe in her new location" (Tr. 541).  On October 24, 2008, Dr. Rochel entered a treatment note indicating that plaintiff had been compliant with her treatment and had shown improvement in her anxiety level (Tr. 544).  Dr. Rochel noted that plaintiff was planning a trip to Miami to visit her sister for a few months (Tr. 544).  The doctor closed plaintiff's file pending her return (Tr. 543-44).

On November 29, 2008, plaintiff returned to Bronx-Lebanon for psychiatric services (Tr 545).  She had returned from Florida where she had visited her sister because Medicaid did not cover her in Florida and she needed her medications (Tr. 545-46).  Plaintiff reported that she had anxiety, was depressed and had difficulty sleeping but was observed to be quiet, calm, cooperative and with a stable mood and appropriate affect (Tr. 545).  On January 7, 2009, plaintiff saw Dr. Rochel and reported that she had just returned again from visiting her parents in Georgia and sister in Florida (Tr. 546).  Dr. Rochel assessed plaintiff as "quiet, calm, cooperative, has good eye contact; well-groomed, affect is anxious" (Tr. 546).

In a letter dated January 7, 2009, Dr. Rochel noted that plaintiff was a victim of domestic violence, had received monthly treatment since 2005 and took Seroquel, Benadryl and Paxil for PTSD and generalized anxiety disorder (Tr. 596).

Plaintiff saw Dr. Rochel again in February 2009 and the doctor noted that plaintiff was quiet, calm, cooperative and with a stable mood and an appropriate affect (Tr. 547-48).

In a report dated March 5, 2009, Dr. Rochel opined that plaintiff was unable to work for at least 12 months due to generalized anxiety disorder and PTSD, which caused panic attacks, insomnia, forgetfulness, poor concentration and fatigue. He noted that plaintiff attended psychotherapy and took psychotropic medication (Tr. 444-45, 493-94).

In April 2009, Dr. Rochel stated that plaintiff was "depressed, isolative [and had] poor energy" but was compliant with treatment and denied nightmares or flashbacks (Tr. 559). Her GAF score was 60[5] (Tr. 560).  Dr. Rochel indicated that

---

[5]"The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008), quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 2000)).  A score of 41-50 indicates serious symptoms, a score of 51-60 indicates moderate symptoms and a score of 61-70 indicates some mild symptoms or some difficulty in social or occupational functioning, but generally functioning "pretty well."  See Global Assessment of

(continued...)

plaintiff had a stable home, was motivated for treatment and had good communications skills and did not abuse drugs or alcohol (Tr. 560).  Dr. Rochel prepared a detailed treatment plan for plaintiff, which included medication, psychotherapy and social support (Tr. 560-68).

In a letter dated June 12, 2009, Dr. Rochel stated that plaintiff had received monthly treatment since July 2008 and took psychotropic medication for major depressive disorder[6] and PTSD (Tr. 595).

In January and July 2010, psychiatrist Dr. Nataliya Gulyayeva noted that plaintiff received treatment for major

_____

[5](...continued)
Functioning, New York State Office of Mental Health, available at https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_ functioning.pdf (last visited Dec. 28, 2016).

[6]Major depressive disorder is "a mood disorder characterized by the occurrence of one or more major depressive episodes (q.v.) and the absence of any history of manic, mixed, or hypomanic episodes." Dorland's at 551.  Major depressive episode refers to

> a period of two weeks or longer characterized by daily
> and day-long depressed mood or loss of interest or
> pleasure in virtually all activities . . . .  Also
> present is some combination of . . . altered appetite,
> weight, or sleep patterns, psychomotor agitation or
> retardation, diminished capacity for thinking,
> concentration, or decisiveness, lack of energy and
> fatigue, feelings of worthlessness, self-reproach, or
> inappropriate guilt, recurrent thoughts of death or
> suicide, and plans or attempts to commit suicide.

Dorland's at 635.

depressive disorder and PTSD, which included the medications Seroquel, Paxil and Ambien (Tr. 600-01, 619).

On September 10, 2010, Dr. Gulyayeva issued a "Psychiatric Medical Report" co-signed by psychiatrist Dr. Marina Cozort (Tr. 605).  The doctors reported seeing plaintiff every two months between July 2008 and September 2010 for depressed mood, anxiety, hypervigilance, insomnia, increased startle responses and crying spells secondary to domestic violence (Tr. 602).  As of September 2010, plaintiff displayed fair hygiene and eye contact, normal speech, linear and goal-oriented thought processes and thought content revealing some preoccupations but no delusions (Tr. 602).  Plaintiff was anxious, her mood was "down" and her affect was labile (Tr. 603).  Her attention was fair, her concentration was impaired, but she was fully oriented and her memory was normal (Tr. 603).  Plaintiff's ability to perform calculations and serial sevens was normal (Tr. 603).  She had fair insight and judgment (Tr. 603).  Plaintiff also reported that she did not leave home without her sister because she was afraid (Tr. 604).  Plaintiff reported that she communicated only with close friends, relatives and doctors, and experienced hypervigilance and feared that her ex-husband may be released from prison and find her.  She was not suicidal (Tr. 604).

A few days later, Drs. Gulyayeva and Cozort completed a form with check-boxes entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" (Tr. 606-08). The doctors indicated that plaintiff had an "extreme" limitation in interacting appropriately with the public and a "marked" limitation in responding appropriately to usual work situations and to changes in work routine (Tr. 606-07). The doctors also checked prompts indicating that plaintiff had "moderate" limitations carrying out and making judgments relating to simple work-related decisions and interacting appropriately with supervisors and co-workers (Tr. 606-07). Plaintiff had a "mild" limitation in understanding and remembering simple instructions (Tr. 606).

In a letter dated August 30, 2011, psychiatrist Dr. Gloria Thambirajah reported that plaintiff had been a patient at Bronx-Lebanon's outpatient psychiatry clinic since 2007 (Tr. 679). At plaintiff's most recent appointment, Dr. Thambirajah increased plaintiff's dosage of Seroquel XR, maintained her dosage of Paxil and added Ambien and Vistaril to treat anxiety. Dr. Thambirajah diagnosed plaintiff with major depressive disorder and PTSD (Tr. 679).

On March 14, 2012, Dr. Thambirajah evaluated plaintiff and noted that she was well-groomed, demonstrated good eye contact and was cooperative (Tr. 693-94). Her psychomotor

11

behavior was normal, her mood was "better," and her affect was appropriate, congruent to mood and "mildly anxious" (Tr. 694). Plaintiff's speech was "non-pressured," her thought processes were coherent, logical and directed and she did not evidence any hallucinations or delusions (Tr. 694). Plaintiff was neither homicidal nor suicidal, was fully conscious and oriented and her attention and memory were intact (Tr. 694). Her reasoning was normal, her intelligence was average, her insight was fair, her judgment was intact and her impulse control was adequate (Tr. 694). Dr. Thambirajah diagnosed plaintiff with a recurrent episode of a severe major depressive disorder, with psychotic behavior,[7] PTSD and found that plaintiff had a GAF score of 68 (Tr. 694).

Plaintiff next saw Drs. Cozort and Thambirajah on March 29, 2012 for a follow up visit and renew her prescriptions; plaintiff reported doing "the same" on her current medication without side effects (Tr. 696). Dr. Thambirajah observed that plaintiff's mood was unchanged, but that her affect was less anxious (Tr. 697). Otherwise, her mental status examination

_____

[7]Psychotic means characterized by "psychosis," which is a "mental disorder characterized by gross impairment in reality testing" or "in a more general sense . . . [a] mental disorde[r] in which mental functioning is so impaired that it interferes grossly with the patient's capacity to meet the ordinary demands of life." Dorland's at 1550.

findings were unchanged from her previous visit (Tr. 694, 697).
Dr. Thambirajah assessed plaintiff as clinically stable and at
her baseline (Tr. 697).  The following month, Drs. Cozort and
Thambirajah reiterated the assessment of a recurrent episode of
severe, major depressive disorder, with psychotic behavior and
PTSD and found that plaintiff had a GAF score of 62 (Tr. 699).
The doctors opined that plaintiff was "minimally improved" since
her last treatment review (Tr. 699).

        Plaintiff saw Drs. Cozort and Thambirajah again in June
2012 and was in no acute distress (Tr. 703-04).  Both doctors
found that the results of a mental status examination were the
same as they were on March 14, 2012 and Dr. Cozort opined that
plaintiff was clinically stable at her baseline (Tr. 704, 707).
Dr. Thambirajah diagnosed PTSD and found that plaintiff had a GAF
score of 68 (Tr. 707).

        In July 2012, plaintiff saw psychiatrist Dr. Dora
Duque, who noted that plaintiff was calm, cooperative, well-
groomed and open to discussing her history of experiencing
domestic violence (Tr. 712).  Plaintiff reported that she had
nightmares about the incident and that her memory was somewhat
impaired, which Dr. Duque believed could be a side effect of
Ambien (Tr. 712).  Dr. Duque observed that plaintiff presented
with a normal mood and appropriate affect, had good insight,

13

mildly impaired judgment and fair impulse control and reported
some auditory hallucinations "on and off" (Tr. 712).  The remain-
der of Dr. Duque's findings were the same as previous assessments
by Dr. Cozort and Dr. Thambirajah except that Dr. Duque assessed
plaintiff's judgment to be "mildly impaired" (Tr. 712).  Dr.
Duque noted that plaintiff was clinically stable and that she had
severe recurrent episodes of a major depressive disorder, with
psychotic behavior, PTSD and that plaintiff had a GAF score of 70
(Tr. 709, 713).

        Plaintiff followed up with Dr. Duque in September 2012
and reported that her depression had worsened over the preceding
month, that she had a low energy level, an inability to feel
pleasure, nightmares and a fear of going outside (Tr. 714-15).
Dr. Duque observed that plaintiff "looked depressed with con-
stricted affect and was talking in soft tone of voice," and
assessed her mood as "bad, depressed, scared," and her affect as
congruent to her mood (Tr. 715).  Dr. Duque found that plain-
tiff's judgment was "age appropriate" and that her mental status
was otherwise unchanged from July 2012 (Tr. 715).

        In October 2012, plaintiff saw Drs. Duque and Cozort
who noted that plaintiff was calm, well-groomed and cooperative
and that plaintiff reported a slight improvement in her mood
since Well-butrin was added to her medication regimen (Tr. 721-

14

22).  Plaintiff's fear of going outside had increased because of an upcoming court hearing regarding the domestic violence case against her ex-husband (Tr. 722).  Dr. Duque noted that plaintiff denied psychotic symptoms, her mood was "all right" and her affect was congruent; she exhibited adequate impulse control and her attention and concentration were intact (Tr. 722).  Dr. Duque diagnosed a recurrent episode of severe major depressive disor-der, with psychotic behavior, PTSD and that plaintiff had a GAF score of 65 (Tr. 718, 721).  Dr. Duque noted that plaintiff's "psychiatric symptoms ha[d] diminished and stabilized but [that she needed] to be maintained on a psychiatric medication regimen" (Tr. 719, 723).

In November 2012, during a visit with Dr. Duque, plaintiff denied any new stressors or changes in her life and continued to feel "down" and was afraid that her ex-husband would come and kill her (Tr. 724-25).  She planned to travel to Georgia to spend a week with her parents (Tr. 725).  Plaintiff denied any psychotic symptoms, suicidal or homicidal ideation or hallucina-tions (Tr. 725).  Dr. Duque observed that plaintiff was depressed and that her affect was labile and tearful (Tr. 725).  Plain-tiff's attention and concentration were intact, her judgment was mildly impaired, her insight was fair and her impulse control was adequate (Tr. 725).  Dr. Duque opined that plaintiff was compli-

15

ant with medication and clinically stable and that her symptoms "ha[d] diminished and stabilized" but that she "needs[ed] to be maintained on a psychiatric medication regimen . . . ." (Tr. 725-26).

Plaintiff visited Dr. Duque again in January 2013 and Dr. Duque confirmed her previous diagnoses and assessed a GAF score of 65 (Tr. 727). Plaintiff complained of occasional crying spells and depressed mood, but otherwise reported "good improvement after Wellbutrin was started and up titrated" (Tr. 729). Dr. Duque noted that plaintiff "feels more animated and less anhedonic" (Tr. 729). Plaintiff was anxious about upcoming legal proceedings related to her divorce (Tr. 729). Dr. Duque opined that plaintiff was "demonstrating improvement and her affect is much more brighter ([sic]" (Tr. 729).

In March 2013, plaintiff stated during a visit with Drs. Duque and Cozort that she had learned that her ex-husband had been released from jail and she believed he was looking for her; as a result, plaintiff experienced increased anxiety and difficulty sleeping (Tr. 733-34). Dr. Duque remarked that plaintiff was "very obsessed" with these issues, but that there was no reason to believe that her ex-husband knew how to find plaintiff (Tr. 733). Overall, plaintiff's mood was "bad, depressed," her affect was congruent to mood and she displayed

16

obsessions and preoccupations (Tr. 734).  Dr. Duque and Dr.
Cozort assessed major depressive disorder and PTSD, and deter-
mined that plaintiff had a GAF score of 60 (Tr. 735).

On April 18, 2013, Dr. Duque noted that plaintiff was
calm and cooperative and reported "good improvement," decreasing
anxiety and better sleep (Tr. 737).  Plaintiff was still fearful
that her ex-husband would find her and was depressed (Tr. 737).

On April 9, 2013, Dr. Duque completed a "Medical Source
Statement of Ability to Do Work-Related Activities (Mental)" (Tr.
681-83).  Dr. Duque opined that plaintiff had "moderate" limita-
tions in responding appropriately to changes in a routine work
setting (Tr. 682).  Dr. Duque further opined that plaintiff had
"slight" limitations in the ability to understand and remember
short, simple instructions, to make judgments on simple work-
related decisions, to interact appropriately with the public and
to respond appropriately to work pressures in a usual work
setting (Tr. 681-82).  Dr. Duque concluded that plaintiff had no
limitations in her ability to carry out short, simple instruc-
tions, understand, remember and carry out detailed instructions,
interact appropriately with supervisors and interact appropri-
ately with co-workers (Tr. 681-82).

In May 2013, Dr. Duque noted that plaintiff was "clini-
cally stable on current management," that her "compliance has

17

improved" and that she had "[n]o recent decompensations" (Tr. 740).  Her mood was "better" and her affect was mildly anxious (Tr. 741).  Her insight was fair, her judgment was intact and her impulse control was adequate (Tr. 741).  Dr. Duque diagnosed plaintiff with a recurrent, severe major depressive disorder, with psychotic behavior, PTSD and a GAF score of 68 (Tr. 741).

Plaintiff returned to Dr. Duque in June 2013 and complained of increasing anxiety since she stopped taking Seroquel (Tr. 743).  Dr. Duque noted that plaintiff continued to have "irrational thinking that she will be attacked by her husband who does not know where the patient is," which "limit[s] her very much in her daily activities to the point that she isolates herself and avoid[s] going out most of the time" (Tr. 743). Plaintiff denied hallucinations or suicidal or homicidal ideation (Tr. 743).  Dr. Duque diagnosed plaintiff's mood as anxious and her affect as calm and constricted (Tr. 743). Plaintiff displayed mildly impaired judgment and fair insight, her attention, concentration and cognition were intact, her reasoning was normal, her intelligence was average, her insight was fair, her memory was grossly intact and her impulse control was adequate (Tr. 743-44).  Dr. Duque assessed a recurrent episode of a severe major depressive disorder, with psychotic

18

behavior, PTSD and determined that plaintiff had a GAF score of 65 (Tr. 743).

In August 2013, plaintiff's care was transferred to psychiatrist Dr. Lissette Cortazar, who noted that plaintiff "states that she has no current social stressors[.]  She has been compliant with her medications as prescribed without experiencing side effects" and "denies depressive, manic or psychotic symptoms . . . suicidal and homicidal ideation[,] as well as hallucinations of any type" (Tr. 747).  Dr. Cortazar reiterated plaintiff's prior diagnoses of a severe major depressive disorder, with psychotic behavior, and PTSD (Tr. 746).  The doctor noted that plaintiff "shows remission of her depressive symptoms" and was tolerating her prescribed medications well (Tr. 747).  Dr. Cotazar noted that plaintiff's "psychiatric symptoms have diminished and stabilized" but that she needed to continue her medication (Tr. 748).  Plaintiff returned to see Dr. Cortazar in March 2014 to refill her prescription (Tr. 758).

       b.  Federation Employment and
           Guidance Service ("FEGS") Evaluations

In a February 2009 "Biopsychosocial Summary" FEGS provided the following narrative of plaintiff's psychological condition:

> Client reports history of domestic violence (DV) and
> was in an abusive relationship for 8 years, he physi-
> cally abused her and last incident and last contact
> with perpetuate [sic] was on 02-14-2008 where he
> stabbed her in the buttocks, right knee and hit her in
> the head.  Client filed police report and has an order
> of protection against him, valid for 5 years.  Client
> reports she fears for her life and she does not [know]
> his whereabouts however she does not know if he knows
> her whereabouts and does not feel 'safe.'  Client is
> currently receiving DV services from Crimes Victim
> Unit.

(Tr. 418, 422).  Plaintiff reported to FEGS that she received

sporadic mental health treatment since 2005 and that she took

psychotropic medications as prescribed by her psychiatrist (Tr.

423).  She denied suicidal or homicidal ideation, reported

depressive symptoms, auditory hallucinations and that "at times

[she]  feels like perpetrator is following her" (Tr. 423).

Plaintiff reported that she was unable to use public transporta-

tion because she would become dizzy due to the side effects of

her medication and otherwise "always feels scared" (Tr. 425).  A

PHQ-9 self-assessment[8] yielded a score of 17, indicative of

"moderately severe depression" (Tr. 673).  However, plaintiff was

able to wash dishes and clothes, sweep or mop floors, vacuum,

_____

[8]The PHQ-9 is a questionnaire used to assess the severity of
a patient's depression.  A score of 15 to 19 indicates moderately
severe depression; a score of 10 to 14 indicates moderate depres-
sion; and a score of 5 to 9 indicates mild depression.  See PHQ-9
Questionnaire for Depression Scoring and Interpretation, Univer-
sity of Michigan, available at http://www.med.umich.edu/1info/-
FHP/practiceguides/depress/score.pdf (last visited Dec. 28,
2016).

watch television, make beds, shop for groceries, cook meals,
read, socialize, get dressed, bathe, use the toilet and groom
herself (Tr. 425).

      In a February 2009 mental status examination psychia-
trist Dr. John Spiegel observed that plaintiff's appearance was
neat, she was calm and her affect was constricted (Tr. 434-37,
659-62).  Plaintiff's manner was cooperative, alert and oriented,
her mood was depressed, her form of thought was logical and her
thought content was normal (Tr. 435).  Dr. Spiegel assessed a
"moderate" impairment in plaintiff's ability to follow work
rules, accept supervision, deal with the public, maintain atten-
tion, relate to co-workers, adapt to change and adapt to stress-
ful situations (Tr. 436, 475).  Dr. Spiegel assessed a single
episode of major depressive disorder, PTSD and panic disorder
with agoraphobia (Tr. 436).

      On August 4, 2011, psychiatrist Dr. Jorge Kirchtein
diagnosed plaintiff with PTSD, major depressive disorder, recur-
rent, moderate and determined that plaintiff had a GAF score of
40, with 50 for the past year (Tr. 787-88).  Dr. Kirchtein opined
that plaintiff was unable to work due to a medical condition that
would last at least 12 months (Tr. 788).  On August 19, 2011,
family medicine physician Dr. Charles Pastor at FEGS diagnosed
plaintiff as suffering from recurrent episodes of major depres-

sive disorder, and on August 25, 2011 assessed that plaintiff was unable to work due to a medical condition that would last at least 12 months (Tr. 778-79). Dr. Pastor did not contact plaintiff's treating physician before reaching his assessment (Tr. 776).

On April 11, 2013, "Entitlement Case Specialist" Oneida Rodriguez of FEGS completed a "Function Report" (Tr. 371-78). Plaintiff reported spending most of her day in the house, relying on her sister to complete daily tasks and that she could only concentrate for five minutes at a time (Tr. 371, 376). Plaintiff told Rodriguez that she often spent the entire day in her pajamas, bathed "because of her sister," and did not care about her appearance (Tr. 372-73). Plaintiff also reported needing reminders to take medication and attend medical appointments, and that her sister prepared meals for her (Tr. 373). Plaintiff could use public transportation if she was accompanied by a friend, could shop in stores for food once per month and could pay bills and count change, but did not handle a savings account, checkbook or money orders (Tr. 374). Plaintiff told Rodriguez that her hobby was watching television and that she spent time with her family (Tr. 375). Plaintiff had difficulty concentrating but did not have any difficulty getting along with authority figures (Tr. 376-77).

c. Psychological Consultative
   Examiner Dr. Dmitri Doubakov

On April 1, 2009, plaintiff attended a psychiatric consultative examination with psychologist Dr. Dmitri Bougakov (Tr. 525-28). Plaintiff reported that shehad arrived by taxi and that she lived with a friend (Tr. 525). Plaintiff also reported that she had some difficulty falling asleep, a poor memory, a poor appetite, dysphoric moods, difficulty concentrating and excessive worrying (Tr. 525-26). Plaintiff reported that she had been assaulted by her husband and that she had nightmares from the attack (Tr. 525). Plaintiff did not do chores, but she could dress, bathe, groom herself, manage money, take public transportation with a friend and watch television (Tr. 527).

Dr. Bougakov observed that plaintiff was cooperative, related in an adequate fashion and was appropriately dressed and well-groomed (Tr. 526). She maintained appropriate eye contact, her speech was fluent and her voice was monotonous, but her expressive and receptive language skills were adequate. Plaintiff's thought processes were coherent and goal-directed, her affect and mood were dysphoric, her sensorium was clear and she was fully oriented. Dr. Doubakov assessed that plaintiff's attention, concentration and memory were impaired, but that she was able to count and perform simple calculations (Tr. 526-27).

23

Her cognitive functioning was in the average range and her
general fund of information was "somewhat limited" (Tr. 527).
Plaintiff's insight and judgment were both fair (Tr. 527).

Dr. Bougakov assessed major depressive disorder and
PTSD and noted that plaintiff's psychiatric problem may signifi-
cantly interfere with her ability to function on a daily basis
(Tr. 527).  Vocationally, Dr. Bougakov opined that plaintiff
could follow and understand simple directions and instructions
and could perform simple tasks (Tr. 527).  Plaintiff had some
difficulty relating with others and dealing with stress (Tr.
527).  Dr. Bougakov further concluded that plaintiff "should be
able to maintain attention and concentration and maintain a
regular schedule on a limited basis," and that she is limited in
her ability to learn new tasks (Tr. 527).  However, Dr. Bougakov
concluded that plaintiff could make appropriate decisions (Tr.
527).

d.  State Agency Medical
    Consultant Dr. T. Inman-Dundon

On May 11, 2009, consulting psychologist Dr. T. Inman-
Dundon reviewed the available evidence of record and completed a
form entitled "Mental Residual Functional Capacity Assessment"
(Tr. 583).  Dr. T. Inman-Dundon opined that plaintiff was "capa-
ble of entry level tasks in a low contact setting," was "able to

understand and follow simple directions, make [simple] decisions
and tolerate changes typically present in an unskilled, low
interactive, work setting" (Tr. 585).

            2.  Physical Health Treatment Records

                a.  Primary Care Physician
                    Dr. Ruben Carvajal

        Plaintiff received primary care treatment from Dr.
Ruben Carvajal beginning in 2006, and visited him in August 2008,
October 2008, January 2009 and February 2009 during the relevant
period (Tr. 392-406, 609).  On February 6, 2009, Dr. Carvajal
completed a form for New York City's Human Resources Administra-
tion.  He noted that plaintiff's diagnoses were anxiety and PTSD
and identified panic attacks, auditory hallucinations, insomnia,
forgetfulness, fatigue and a lack of concentration as relevant
clinical findings (Tr. 391).  Dr. Carvajal noted that plaintiff
was receiving psychotherapy and taking psychotropic medication
and checked a box on the form indicating that plaintiff was
"unable to work for at least 12 months" (Tr. 391).

        In September 2010, Dr. Carvajal completed a "Medical
Source Statement of Ability to Do Work-Related Activities (Physi-
cal)," in which he opined that plaintiff could lift up to 20
pounds occasionally and 10 pounds frequently and carry up to 10

                              25

pounds occasionally (Tr. 612-14, 626-30).  Dr. Carvajal further
stated that plaintiff could sit for two hours and stand and walk
for 30 minutes each total in an eight-hour workday and did not
need a cane (Tr. 613).  Dr. Carvajal attributed plaintiff's
physical limitations to her hernia surgery (Tr. 614, 626).  Dr.
Carvajal stated that due to "panic attacks" plaintiff could not
perform activities like shopping, travel without a companion for
assistance, or use standard public transportation (Tr. 617).  Dr.
Carvajal opined that plaintiff could walk without an assistive
device, prepare a simple meal and feed herself, care for her
personal hygiene and sort, handle and use papers or files (Tr.
617).  Dr. Carvajal opined that plaintiff had no visual or
auditory impairments (Tr. 628).

       b.   Treatment Records
           from Bronx-Lebanon Hospital

      Plaintiff was seen at Bronx-Lebanon in February 2008
after she was assaulted by her ex-husband (Tr. 387, 522-24).
Plaintiff had multiple bruises on her face, arms chest and right
thigh (Tr. 522).  Plaintiff reported that her ex-husband as-
saulted her by, among other things, punching her in the face and
back and stamping on her with his feet (Tr. 523).  He also struck
plaintiff in the right buttock with an "unknown object" (Tr.

26

523).  Dr. Srinivasan Krishna diagnosed plaintiff with a trau-
matic left tympanic membrane perforation and left conductive
hearing loss (Tr. 387).  The following month, Dr. Krishna exam-
ined plaintiff's ear and noted that "the perforation is healing
nicely" and that there was a "very small pinpoint opening" (Tr.
388).  In May 2008, Dr. Krishna again stated that plaintiff's
left ear injury was "healing quite nicely" (Tr. 389).

    D.   <u>Proceedings Before the ALJ</u>

        1.  <u>Plaintiff's Testimony</u>

        Plaintiff testified at the administrative hearings that
she was born in 1977 in the Dominican Republic, was separated
from her husband, had no children and lived alone (Tr. 48-49,
807-08).  She arrived in the United States in 1998 after complet-
ing high school in the Dominican Republic (Tr. 48-49, 808).
Plaintiff traveled to the April 20, 2013 hearing by taxi with her
sister (Tr. 48, 58).

        Plaintiff testified that she worked part-time as a
McDonald's cashier for approximately one and a half years and
also worked in a laboratory, in a factory, in telemarketing and
generally had held a number of jobs for brief periods at a time
(Tr. 809-10, 815).  In the Dominican Republic she had worked as a

secretary (Tr. 810).  Plaintiff testified that she stopped looking for work because she was "feeling very bad" (Tr. 814-15).

Plaintiff testified that her husband had tried to kill her, and had been incarcerated and released (Tr. 55-56, 811). She said she sought medical treatment after that assault at Bronx-Lebanon and was hospitalized overnight after the assault (Tr. 811-12).  She testified that she was afraid of her ex-husband and other unnamed persons (Tr. 55-56).  She reported that she was hospitalized for three days in June 2010 for a kidney issue, but had not been hospitalized for mental health issues (Tr. 56-57, 811-12).  She stated at the October 2010 hearing that she was seeing a psychiatrist and that she told him about her nightmares, aural hallucinations and inability to sleep and that the doctor gave her medication to help her sleep (Tr. 812-13).

Plaintiff testified that she could not do her own cooking and cleaning all of the time, that her sister helped her do the cooking and cleaning at home and that she did not social-ize (Tr. 60-62, 813).  Plaintiff testified that she spent her days watching television or visiting her sister and needed "pills" to sleep (Tr. 60, 813-14).  Plaintiff was taking psychotropic medication that "sometimes" gave her headaches and made her dizzy (Tr. 53-55).

28

2.   <u>Vocational Expert Testimony</u>

Vocational expert Dr. David Vandergoot testified at the
April 10, 2013 administrative hearing (Tr. 63, 249-58).  Dr.
Vandergoot identified plaintiff's past work as jobs identified in
the Dictionary of Occupational Titles ("DOT") as cashier, a semi-
skilled position performed at the light exertional level, fast
food worker, an unskilled position performed at the light
exertional level and telephone solicitor, a semi-skilled position
performed at the sedentary exertional level (Tr. 74).  The ALJ
asked the vocational expert to consider an individual with
plaintiff's vocational profile and

> who has no exertional limitations, and has the follow-
> ing other limitations: avoiding concentrated exposure
> to excessive vibration, only working . . . in an atmo-
> sphere where there is moderate noise, like office level
> type noise; avoiding exposure to unprotected heights,
> hazardous machinery and moving machinery . . .
>
> [with] not much exposure to irritants . . .
>
> [with] occasional push/pull foot control; never climb-
> ing ladders, ropes, or scaffolds; and occasionally
> stooping, kneeling, crouching, crawling . . .
>
> [with] no interaction with the public . . .
>
> [with] only occasional decision-making or changes in
> the work setting . . .
>
> [and limited to] simple, routine tasks . . . .

(Tr. 74-75, 78-79).  The expert opined that such a person could
not perform plaintiff's past work but could perform the light,

unskilled positions in the DOT of (1) photocopy machine operator (DOT Code 207.685-014), a position with 5,500 jobs in the region and "about 66,000" jobs nationally; (2) routing clerk (DOT Code 222.687-022), a position with 20,000 jobs in the region and "over 680,000" jobs nationally; and (3) inspector (DOT Code 559.687-074), a position with 14,000 jobs in the region and "over 410,000" jobs nationally (Tr. 74-79).

III.  Analysis

    A.  Applicable Legal
       Principles

       1.  Standard of Review

    The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency." Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015), quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were

supported by substantial evidence, 'the reviewing court is
required to examine the entire record, including contradictory
evidence and evidence from which conflicting inferences can be
drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417 (citation
omitted).

        2.  Determination
           of Disability

       A claimant is entitled to SSI and DIB if the claimant
can establish an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment . . . which has lasted or can be expected to
last for a continuous period of not less than twelve months."[9]
42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v.
Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the
inability to work must last twelve months).  In addition, to
obtain DIB, the claimant must have become disabled between the
alleged onset date and the date on which she was last insured.
See 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315;
McKinstry v. Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (sum-

---

      [9] The standards that must be met to receive SSI benefits
under Title XVI of the Act are the same as the standards that
must be met in order to receive DIB under Title II of the Act.
Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases
addressing the former are equally applicable to cases involving
the latter.

mary order), citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D) and it must be "of such severity" that the claimant cannot perform [her] previous work and "cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), § 1382c(a)(3)(B). Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (internal quotation marks omitted).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v),

33

416.920(a)(4)(i)(v); see Selian v. Astrue, supra, 708 F.3d at
417-18; Talavera v. Astrue, supra, 697 F.3d at 151.  The first
step is a determination of whether the claimant is engaged in
substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i),
416.920(a)(4)(i).  If she is not, the second step requires
determining whether the claimant has a "severe medically determi-
nable physical or mental impairment."  20 C.F.R.
§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If she does, the
inquiry at the third step is whether any of these impairments
meet one of the listings in Appendix 1 of the regulations.  20
C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  To be found
disabled based on a listing, the claimant's medically determina-
ble impairment must satisfy all of the criteria of the relevant
listing.  20 C.F.R. § 404.1525(c)(3); Sullivan v. Zebley, 493
U.S. 521, 530 (1990); Otts v. Comm'r of Soc. Sec., 249 F. App'x
887, 888 (2d Cir. 2007).  If the claimant meets a listing, the
claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii).

        If the claimant does not meet any of the listings in
Appendix 1, step four requires an assessment of the claimant's
residual functional capacity ("RFC") and whether the claimant can
still perform her past relevant work given her RFC.  20 C.F.R.
§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); see Barnhart v. Thomas,

supra, 540 U.S. at 24-25.  If she cannot, then the fifth step

requires assessment of whether, given claimant's RFC, she can

make an adjustment to other work.  20 C.F.R. §§

404.1520(a)(4)(v), 416.920(a)(4)(v).  If she cannot, she will be

found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v),

416.920(a)(4)(v).

     RFC is defined in the applicable regulations as "the

most [the claimant] can still do despite [her] limitations."

20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC,

the ALJ "identif[ies] the individual's functional limitations or

restrictions and assess[es] his or her work-related abilities on

a function-by-function basis, including the functions in para-

graphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."

Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per

curiam), quoting Social Security Ruling 96-8p, 1996 WL 374184 at

*1 (July 2, 1996).  The results of this assessment determine the

claimant's ability to perform the exertional demands of sustained

work which may be categorized as sedentary, light, medium, heavy

or very heavy.[10]  20 C.F.R. §§ 404.1567, 416.967; see Schaal v.

Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may

---

[10]Exertional limitations are those which "affect [plain-
tiff's] ability to meet the strength demands of jobs (sitting,
standing, walking, lifting, carrying, pushing, and pulling)."  20
C.F.R. §§  404.1569a(b), 416.969a(b).

then be found to be limited further by nonexertional factors that restrict claimant's ability to work.[11]   See Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than her past work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the medical-vocational guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's

---

[11]Nonexertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching.  20 C.F.R. §§ 404.1569a(c), 416.969a(c).

RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy." Gray v. Chater, supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383. "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp v. Bowen, supra, 802 F.2d at 606; accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411.  When the ALJ finds that the nonexertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks and citation omitted); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-

vidual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limita-
tions must be considered.").  An ALJ may rely on a vocational
expert's testimony presented in response to a hypothetical if
there is "substantial record evidence to support the
assumption[s] upon which the vocational expert based his opin-
ion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983);
accord Snyder v. Colvin, 15-3502, 2016 WL 3570107 at *2 (2d Cir.
June 30, 2016) (summary order) ("When the hypothetical posed to
the vocational expert is based on a residual functional capacity
finding that is supported by substantial evidence, the hypotheti-
cal is proper and the ALJ is entitled to rely on the vocational
expert's testimony."); Rivera v. Colvin, 11 Civ. 7469, 2014 WL
3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided
that the characteristics described in the hypothetical question
accurately reflect the limitations and capabilities of the
claimant and are based on substantial evidence in the record, the
ALJ may then rely on the vocational expert's testimony regarding
jobs that could be performed by a person with those characteris-
tics.").

3.  Treating Physician Rule

In considering the evidence in the record, the ALJ must give deference to the opinions of a claimant's treating physicians.  A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 416.927(c)(2); see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. § 416.927(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'"  Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).  Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the

opinion should be given.  These factors include:  (1) the length
of the treatment relationship and the frequency of examination,
(2) the nature and extent of the treatment relationship, (3) the
medical support for the treating physician's opinion, (4) the
consistency of the opinion with the record as a whole, (5) the
physician's level of specialization in the area and (6) other
factors that tend to support or contradict the opinion.  20
C.F.R. § 416.927(c)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d
at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at
*16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.); Matovic v. Chater,
94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996)
(McKenna, D.J.).  Although the foregoing factors guide an ALJ's
assessment of a treating physician's opinion, the ALJ need not
expressly address each factor.  Atwater v. Astrue, 512 F. App'x
67, 70 (2d Cir. 2013) (summary order) ("We require no such
slavish recitation of each and every factor where the ALJ's
reasoning and adherence to the regulation are clear.").

        As long as the ALJ provides "good reasons" for the
weight accorded to the treating physician's opinion and the ALJ's
reasoning is supported by substantial evidence, remand is unwar-
ranted.  See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see
also Atwater v. Astrue, supra, 512 F. App'x at 70; Petrie v.
Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order);

Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order).  "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record."  Krull v. Colvin, 15-4016, 2016 WL 5417289 at *1 (2d Cir. Sept. 27, 2016) (summary order) (citation omitted).  The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a physician's determination to this effect where it is contradicted by the medical record.  See Wells v. Comm'r of Soc. Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).  The ALJ may rely on a consultative opinion where it is supported by substantial evidence in the record.  See Richardson v. Perales, supra, 402 U.S. at 410; Camille v. Colvin, 652 F. App'x 25, 27-28 (2d Cir. 2016) (summary order); Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995); Mongeur v. Heckler, supra, 722 F.2d at 1039.

### 4.  Credibility

In determining a claimant's RFC, the ALJ is required to consider the claimant's reports of pain and other limitations, 20 C.F.R. § 416.929, but is not required to accept the claimant's subjective complaints without question.  McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980).

"It is the function of the [Commissioner], not [the reviewing

courts], to resolve evidentiary conflicts and to appraise the

credibility of witnesses, including the claimant." Carroll v.

Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983);

see also Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984);

Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588,

591-92 (2d Cir. 1984).  The ALJ has discretion to weigh the

credibility of the claimant's testimony in light of the medical

findings and other evidence in the record.  Marcus v. Califano,

615 F.2d 23, 27 (2d Cir. 1979).

     The regulations provide a two-step process for evaluat-

ing a claimant's subjective assertions of disability.

          At the first step, the ALJ must decide whether the
          claimant suffers from a medically determinable impair-
          ment that could reasonably be expected to produce the
          symptoms alleged.  20 C.F.R. § 404.1529(b).  That
          requirement stems from the fact that subjective asser-
          tions of pain alone cannot ground a finding of disabil-
          ity.  20 C.F.R. § 404.1529(a).  If the claimant does
          suffer from such an impairment, at the second step, the
          ALJ must consider "the extent to which [the claimant's]
          symptoms can reasonably be accepted as consistent with
          the objective medical evidence and other evidence" of
          record.  Id.  The ALJ must consider "[s]tatements [the
          claimant] or others make about [the claimant's] impair-
          ment(s), [the claimant's] restrictions, [the claim-
          ant's] daily activities, [the claimant's] efforts to
          work, or any other relevant statements [the claimant]
          make[s] to medical sources during the course of exami-
          nation or treatment, or to [the agency] during inter-
          views, on applications, in letters, and in testimony in
          [its] administrative proceedings."  20 C.F.R. §
          404.1512(b)(3); see also 20 C.F.R. § 404.1529(a);
          S.S.R. 96-7p.

                              42

Genier v. Astrue, supra, 606 F.3d at 49 (alterations and emphasis in original); see also 20 C.F.R. § 416.929(a); Snyder v. Colvin, 15-3502, 2016 WL 3570107 at *2 (2d Cir. June 30, 2016) (summary order), citing SSR 16-3P, 2016 WL 1119029 (Mar. 16, 2016).[12]  The ALJ must explain the decision to reject a claimant's testimony "'with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief' and whether [the ALJ's] decision is supported by substantial evidence."  Calzada v. Astrue, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010) (Sullivan, D.J.) (alteration in original), quoting Fox v. Astrue, 05 Civ. 1599 (NAM)(DRH), 2008 WL 828078 at *12 (N.D.N.Y. Mar. 26, 2008); see also Lugo v. Apfel, 20 F. Supp. 2d 662, 664 (S.D.N.Y. 1998) (Rakoff, D.J.).  The ALJ's determination of credibility is entitled to deference.  See Snell v. Apfel, 177 F.3d 128, 135-36 (2d Cir. 1999) ("After all, the ALJ is in a better position to decide issues of credibility"); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) (Leisure, D.J.) ("Deference should be accorded the ALJ's determination because he heard Plaintiff's testimony and observed his demeanor.").

---

[12]SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), and clarifies the policies set forth in the previous SSR. See SSR 16-3P, supra, 2016 WL 1237954.

B.   The ALJ's
     <u>Decision</u>

The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 22-32).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity during the relevant period (Tr. 20).

At step two, the ALJ found that plaintiff suffered from the following severe impairments and that each had lasted for more than twelve months:  "status post tympanic left ear drum perforation, allergic rhinitis, a major depressive disorder and a post-traumatic stress disorder (PTSD)" (Tr. 20).  The ALJ also found that plaintiff had a non-severe impairment:  pyelonephritis (Tr. 20).[13]

At step three, the ALJ found that plaintiff's disabili-ties did not meet the criteria of the listed impairments and was therefore not entitled to a presumption of disability (Tr. 21-23).  The ALJ observed that there was no evidence to support the criteria of any listing and that "[n]o treating or examining physician has mentioned findings that meet or medically equal in severity" the criteria of any listed impairment (Tr. 21).  In

---

[13]Pyelonephritis refers to "inflammation of the kidney and renal pelvis because of bacterial infection." <u>Dorland's</u> at 1559.

reaching her conclusion, the ALJ specifically analyzed whether plaintiff's mental impairments met listings 12.04 (affective disorders), 12.06 (anxiety related disorders) and listing 2.10 (hearing loss without cochlear implantation)[14] (Tr. 21).  20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ then determined that plaintiff retained the RFC to perform "light work" except that she must

> avoid concentrated exposure to excessive vibration and requires a relatively clean work environment; is lim-ited to an atmosphere with moderate noise such as an environment with office type noise; must avoid exposure to unprotected heights, hazardous machinery and moving machinery; avoid concentrated exposure to extreme cold, wetness and humidity; only occasional pushing and pulling; occasional bilateral foot control; never climb ladders, ropes and scaffolds; only occasional stooping, kneeling, crouching or crawling; no interaction with the public; occasional interaction co-workers; only occasional decision making or changes in the work setting; and limited to simple, routine tasks.

(Tr. 23).

To reach her RFC determination, the ALJ examined the opinions of the treating and consulting physicians and assessed the weight to give to each opinion based on the objective medical

---

[14]"A cochlear (koe-klee-er) implant is a device that provides direct electrical stimulation to the auditory (hearing) nerve in the inner ear." Cochlear Implants, American Speech-Language-Hearing Association, available at http://www.asha.org/public/hearing/Cochlear-Implant/ (last visited Dec. 28, 2016).

record, including the treatment notes of plaintiff's treating physician following her alleged onset date.

The ALJ gave "little weight" to the February 2009 opinion of Dr. De La Cruz and the other FEGS personnel because the opinion that plaintiff was temporarily disabled from all work was contradicted by FEGS' findings that plaintiff was moderately limited in work-related functions and because plaintiff's treating psychologists had assessed her mental state as stable with her anxiety level decreasing since mid-2008 (Tr. 28). Further, the ALJ noted that Dr. De La Cruz rendered his opinion on the same day that he found that plaintiff had only a single episode of major depressive disorder, which was not enough to disable her from any work for an extended period (Tr. 28).

The ALJ gave "little weight" to Dr. Carvajal's and Dr. Rochel's February and March 2009 opinions that plaintiff had been disabled for a year because they were contradicted by the other evaluations in the medical record in that one year period that showed that plaintiff was mentally stable and that her anxiety was improving (Tr. 28).

Dr. Bougakov's April 2009 consultative opinion that plaintiff's impairments could interfere with her ability to function was given "little weight" because he also noted that

plaintiff could perform simple tasks and because his assessment was based on a one-time evaluation (Tr. 28).

Dr. Inman-Dudon's May 2009 consultative opinion that plaintiff had only "mild" social limitations was given "little weight" because there was evidence that plaintiff complained of paranoia and fear of her ex-husband for years after she was initially assaulted (Tr. 28). However, Dr. Inman-Dudon's opinion that plaintiff could perform entry-level tasks in a low-contact setting was given "great weight" because it was consistent with the treatment records from that time period (Tr. 29).

Dr. Cozort's September 2010 opinion that plaintiff had moderate limitations in carrying out simple instructions and simple work related decisions was given "little weight" because it contradicted the mental examination findings that plaintiff's concentration was normal as well as plaintiff's statements to SSA (Tr. 28). At the same time, the ALJ gave "weight" to Dr. Cozort's view that plaintiff has extreme limitations in interacting with the public, as the evidence supported plaintiff's claim of insistent flashbacks and socialization limited to family and friends (Tr. 28-29).

The ALJ also gave "some weight" to Dr. Duque's April 2013 opinion that plaintiff had little to no limitations in most work related activities because it was consistent with her mental

47

status examinations and the improvement in plaintiff's symptoms up to that date (Tr. 29).

Finally, the ALJ gave significant weight to Dr. Carvajal's opinion regarding plaintiff's physical, hearing and pulmonary limitations in a vocational setting (Tr. 29).

In reaching her RFC determination, the ALJ also considered plaintiff's testimony and found that while plaintiff's medically determinable impairments could reasonably have caused her alleged symptoms, a review of the entire case record showed that plaintiff's statements regarding their intensity, persistence and limiting effects were not entirely credible (Tr. 24, 26-27). The ALJ noted that as early as May 2008, four months after her alleged onset date, her treating physicians assessed plaintiff's mood as stable and her anxiety symptoms to be improving (Tr. 26). The ALJ also noted that plaintiff's mental status examinations were "essentially normal in 2008, 2009, 2010, 2012 and 2013," that her "mental state has been repeatedly assessed as stable and her anxiety symptoms were described as improved from at least May 2008 through August 2013 with very few instances of actual psychological limitations upon objective testing," and that her GAF scores have ranged from the "60s range, indicating only moderate mental limitations" to 70, indicating that plaintiff was functioning well (Tr. 27). Thus, based on these and

48

other findings in the entire case record, the ALJ assessed the
credibility of plaintiff's statements and determined that plain-
tiff had the RFC to perform "light work" with the "moderate
pulmonary, auditory and environmental limitations" described
above (Tr. 27).

At step four, the ALJ concluded that plaintiff had no
past relevant work, as her prior jobs were not performed at a
level of substantial gainful activity (Tr. 29-30).

At step five, relying on the testimony of the voca-
tional expert, the ALJ found that jobs existed in significant
numbers in the national economy that plaintiff could perform,
given her RFC, age and education (Tr. 31-32).  The ALJ noted that
the vocational expert testified that given plaintiff's age,
education, work experience and RFC, she could perform work
defined in the DOT as inspector, routing clerk and photocopy
machine operator (Tr. 31).  Concluding that the expert's testi-
mony was consistent with information in the DOT, the ALJ deter-
mined plaintiff could perform those occupations, and accordingly
was not disabled (Tr. 30-32).

  C.  Analysis of the
      ALJ's Decision

The Commissioner contends that the ALJ's decision was
supported by substantial evidence and should be affirmed (Memo-

randum of Law in Support of Judgment on the Pleadings, dated

December 18, 2015, (D.I. 16)).  Although plaintiff has not

responded to the motion, in plaintiff's Complaint, she has

asserted that she has been disabled since February 14, 2008 due

to "depres[s]ion" and "Major depressive disorder, recurrent

episode" (Complaint (D.I. 2) at 1).

      As set out above, the ALJ went through the five-step

process required by the regulations.  The ALJ's analysis at steps

one, two and four were decided in plaintiff's favor and the

government has not challenged those findings.[15]  I shall there-

fore analyze whether the ALJ's analysis at steps three and five

complied with the applicable legal standards and were supported

by substantial evidence.

          1.  ALJ's Analysis at
               <u>Step Three:  The Listings</u>

      The ALJ's finding that plaintiff's mental impairments

did not meet a listing is supported by substantial evidence

---

     [15]At step two, the ALJ found that plaintiff suffered from
pyelonephritis as a non-severe infection; there is no evidence
that plaintiff or any of her physicians have, at any point,
asserted that plaintiff's kidney condition was severe or
disabling (Tr. 57 (plaintiff's testimony that her kidney
condition was resolved following a procedure at the hospital and
that she no longer took medication for it)).  Thus, the ALJ's
finding with this regard is at most neutral and was not decided
against plaintiff.

because although plaintiff met some of the criteria for the mental disorders described in listings 12.04 and 12.06, plaintiff did not meet the functional limitations described in those listings.  Further, the ALJ's finding that plaintiff's ear injury did not meet listing 2.10 was also legally correct and supported by substantial evidence.

The ALJ considered listings 12.04 (affective disorders) and 12.06 (anxiety related disorders), under which a claimant must meet the criteria of both paragraph A (medical findings) and the functional limitations of either paragraph B or C of the listings to be found disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 ("We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropri- ate) of the listed impairment are satisfied.").  The ALJ con- cluded that plaintiff met some of the paragraph "A" criteria of these listings (Tr. 21), but properly concluded that plaintiff did not meet the B or C criteria of either listing (Tr. 21).

To satisfy the "paragraph B" criteria for either of these listings, the mental impairment must result in at least two of the following:  (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social function- ing; (3) marked difficulties in maintaining concentration,

51

persistence, or pace or (4) repeated episodes of decompensation, each of extended duration. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 ¶ B, § 12.06 ¶ B.

The record indicates that although plaintiff had moderate restrictions in her activities of daily living, social functioning, and concentration, persistence, or pace, none of those areas rose to the "marked" level (Tr. 21-22). For instance, regarding daily living, plaintiff was able to perform self-care and household chores, albeit with "difficulty" (Tr. 22, 348-50, 353, 374, 376, 473, 527, 649). Plaintiff could wash dishes, wash clothes, vacuum, sweep or mop floors, make beds, shop for groceries and dress and groom herself (Tr. 425, 472, 648-49, 770). Although plaintiff reported that she could not use public transportation alone, she traveled to visit family in Florida and Georgia during the relevant time period and there is no indication in the record that she was accompanied on these trips (Tr. 545-46, 725, 814).

The limitations on plaintiff's social functioning were moderate overall. Although plaintiff claimed to be fearful when she was around others or in public, she lived alone and never lost a job due to an inability to get along with others (Tr. 22, 347, 354, 458, 813). Plaintiff's treating psychiatrist Dr. Cozort noted in September 2010 that plaintiff had a "marked"

limitation in her ability to respond appropriately to work
situations or handle complex instructions and an "extreme"
limitation related to her inability to interact appropriate in
public (Tr. 606-08).  However, the doctor found that she only
suffered mild limitations in understanding and remembering simple
instructions and moderate limitations in carrying out simple
instructions and the ability to make judgments on simple work-
related decisions (Tr. 606-07).  A second treating psychiatrist,
Dr. Duque, reported in April 2013 that plaintiff's limitations
ranged from "none" to "moderate" in all areas of work-related
activities, including understanding, remembering and carrying out
detailed instructions, interacting appropriately with the public
and responding appropriately to work pressures and changes in
work settings (Tr. 681-82, 741).  Thus the ALJ's conclusion that
plaintiff did not have a marked impairment of social functioning
was supported by the record.

With respect to plaintiff's ability to concentrate, the
ALJ correctly noted that plaintiff reported that she could be
tired and forgetful, but also reported that she was able to
follow instructions; plaintiff's doctors also assessed plain-
tiff's attention and concentration as intact (Tr. 22, _citing_ 353,
693-752).

Finally, there were no reported episodes of decompensation for an extended duration, and plaintiff had never been hospitalized for mental health issues (Tr. 22, 56-57, 579-80, 686, 740).  Thus, the ALJ's finding that plaintiff did not meet any of the paragraph "B" criteria for listings 12.04 and 12.06 was supported by the substantial evidence in the record.

The paragraph "C" criteria for listing 12.04 are satisfied by a medically documented chronic affective disorder that has lasted at least two years and caused more than a minimal limitation of ability to do basic work activities, with at least one of the following:  (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that resulted in such a marginal adjustment that even a minimal increase in mental demands of change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living environment.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 ¶ C.  For listing 12.06 the paragraph "C" criteria are satified by a "complete inability to function independently outside the area of one's home."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 ¶ C.

The ALJ considered the "C" criteria and again noted that there was no evidence of any episodes of decompensation (Tr.

22-23,  56-57, 579-80, 686, 740).  Further, there was no evidence

of a residual disease process that would render any increase in

mental demands intolerable or an inability to function outside a

highly supportive living environment (Tr. 22-23).  Indeed, the

treatment records indicate that plaintiff lived with her sister

for only a short period of time and otherwise lived alone

throughout the period at issue (Tr. 347, 371, 420).  She also

traveled out of state during the relevant time period and there

is no indication that she was accompanied on these trips, which

supported the conclusion that she could function outside of her

home (Tr. 545-46, 725).  Thus, the ALJ's finding that plaintiff's

mental impairments did not meet a listing applied the relevant

legal standards and was supported by substantial evidence.

The ALJ also considered whether plaintiff met listing

2.10, which refers to "Hearing loss without a cochlear Implanta-

tion."  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 2.00.  The ALJ

correctly found that there was no evidence in the record that

plaintiff's ear injury was accompanied by the level of hearing

loss required to meet that listing (Tr. 21).  As noted above,

although plaintiff suffered trauma to her ear, her doctor noted

in May 2008 that plaintiff's left ear injury was "healing quite

nicely" (Tr. 88, 389).  There was no evidence that plaintiff was

prescribed a hearing aid (Tr. 353, 377, 389).  Thus, the ALJ's

55

finding that plaintiff did not meet this listing complied with the correct legal standards and was supported by substantial evidence.

> ### 2.  ALJ's Analysis at
> ### Step Three:  RFC Assessment

Although there is some contradictory evidence in the record, the ALJ's RFC determination was supported by substantial evidence.  The ALJ reached her RFC assessment by reviewing the objective medical record, taking into account the supported opinions of plaintiff's treating and consulting physicians, and taking into account plaintiff's subjective reports of her symptoms where they were not contradicted by other evidence in the record.

> #### a.  Review of Plaintiff's
> #### Treatment Records

The ALJ's RFC determination was supported by the objective findings of plaintiff's treating physicians at and following the alleged onset date of plaintiff's disability.

A review of plaintiff's treatment record supports the ALJ's conclusion that the treatment records showed that although plaintiff suffered from PTSD and major depressive disorder, she often had normal mental status examination results, that her

functional limitations were moderate overall and that her symp-
toms improved with medication and treatment.  In July 2008, Dr.
Rochel found that plaintiff was depressed and her affect was
constricted and diagnosed her with PTSD (Tr. 535-36).  However,
plaintiff's mental status examination results were otherwise
normal, and Dr. Rochel assessed a GAF score of 55, which indi-
cates moderate impairment (Tr. 535-36).  In treatment notes from
September and October 2008, Dr. Rochel found that plaintiff's
mental state was stable and, at plaintiff's request, decreased
plaintiff's psychotherapy visits to once a month (Tr. 540).
Plaintiff was discharged from psychotherapy treatment at Bronx
Lebanon in October 2008 because she was feeling better and
because she planned to see her sister in Florida for several
months (Tr. 541-44).  In February 2009 plaintiff returned to
Bronx Lebanon and reported that she felt "good" and had a stable
mood, though she continued to fear her ex-husband (Tr. 547-48).
In April 2009, Dr. Rochel found that plaintiff had an improved
GAF score of 60 (Tr. 560).  In September 2010, plaintiff's
psychiatrists at Bronx Lebanon described plaintiff's attention as
"fair," her concentration as "impaired," her memory, information
and ability to perform calculations as "normal," and her insight
and judgment as "fair" (Tr. 602-03).

In November 2012, plaintiff's treating psychiatrist noted that plaintiff was clinically stable and that she continued to comply with her medication regimen (Tr. 725). At that point, a mental status examination showed that plaintiff's attention and concentration were "intact," her intelligence average, her memory was grossly intact, her reasoning was normal and her judgment "mildly impaired" (Tr. 725). In that same month, plaintiff planned a visit to Georgia to visit her parents (Tr. 545). By the summer of 2013, plaintiff's doctors assigned her a GAF score between 65 and 68, which indicates that plaintiff had "mild" symptoms and that she was generally functionally well (Tr. 741, 744). In June of 2013, plaintiff's mental status examination results showed that plaintiff's attention and concentration were intact, her intelligence was average, her memory was grossly intact, her reasoning was normal and her judgment remained "mildly impaired" (Tr. 743-44). In August 2013 and later in March 2013, Dr. Cortazar diagnosed plaintiff with major depressive disorder and PTSD but noted that her mental status examination showed "remission of her depressive symptoms" and that she was tolerating her prescription regimen well (Tr. 747-48, 758). Thus, although the treatment records indicate that plaintiff continued to have anxiety and fear of her ex-husband that limited her in certain aspects of her life, her mental status examina-

tions showed overall normal results that improved throughout the period under consideration.

b. Assessment of
   Treating Physician Opinions

Although the ALJ did not explicitly go through the six-step framework for evaluating a treating physician's opinion, the ALJ provided good reasons for affording less weight to some of the plaintiff's treating physicians opinions where they were not supported by the treatment records. Based on a review of plaintiff's mental health treatment records that are described above, the ALJ discounted the opinions of both the doctors who found plaintiff unable to work and those who found that she had no limitations on her ability to work; rather, the ALJ accepted the views of those whose opinions accorded with the evidence, including an assessment that plaintiff had at least one extreme limitation in dealing with the public.

The ALJ's decision to give the FEGS doctors' opinions less than controlling weight was not erroneous because their opinions were contradicted by their own objective findings and plaintiff's treatment records. For example, in 2009, Dr. De La Cruz of FEGS opined that plaintiff had a temporary disability (Tr. 662-63), but Dr. De La Cruz assessed plaintiff as having only one episode of major depressive disorder (Tr. 661). The

59

ALJ's decision to give "little weight" to this opinion was not erroneous because there was no support for the conclusion that a single episode of major depressive disorder could temporarily disable plaintiff from any form of work (Tr. 28). Further, the ALJ correctly noted that the FEGS physicians' opinions were based on plaintiff's subjective complaints and were inconsistent with the treatment records described above (Tr. 28, citing generally Exhibits 3F, 5F, 14F, 16F, 20F; see also Tr. 471, 650, 666-68).

The ALJ also gave good reasons for giving "little weight" to Dr. Carvajal's February 2009 opinion, Dr. Rochel's March 2009 opinion, Dr. Bougakov's April 2009 opinion and Dr. Cozort's September 2010 mental medical source statement that plaintiff was totally unable to work or that her impairments would significantly interfere with her ability to function on a daily basis (Tr. 28-29). The ALJ found that each of these opinions was contradicted by the treatment records, assessments and the medical record showing that for years following the 2008 assault, plaintiff's mental status examinations were "normal" including "her 2013 psychiatric records [which showed] that after a decade of psychological treatment . . . [plaintiff's] depressive symptoms had been in remission" (Tr. 28). As discussed above, plaintiff's treatment records over the course of the treatment period show that she continued to fear her ex-husband

and traveling alone, but that her symptoms had improved with
medication and treatment (See discussion, supra, pages 56-59).
Further, although Drs. Cozort, Carvajal and Bougakov opined that
plaintiff had limitations in handling complex tasks, they recog-
nized that she could execute simple tasks (Tr. 606-07 (Dr.
Cozort), 617 (Dr. Carvajal), 526-27 (Dr. Bougakov)).  In addi-
tion, although Dr. Rochel opined in March 2009 that plaintiff
could not work at all for at least 12 months due to "Generalized
Anxiety Disorder" and "Post traumatic stress [disorder]" his
treatment notes in that time period do not support this conclu-
sion.  In February 2009, Dr. Rochel noted that plaintiff had a
stable mood, reported feeling "good," she had a good appetite,
good sleep, complied with her medication and denied
suicidal/homicidal ideation or any hallucinations (Tr. 547).  In
April 2009, Dr. Rochel no longer diagnosed plaintiff with major
depressive disorder and noted her primary diagnosis as PTSD (Tr.
558).  At that time, plaintiff was depressed but was compliant
with treatment and continued to deny any phobia, paranoia or
delusions (Tr. 558-59).  Thus, the ALJ's decision not to give
great weight to the opinions of these doctors that plaintiff was
totally disabled was not erroneous because the ALJ's assessment
was supported by the overall medical record, including those
doctors' own assessments and treatment notes.

The ALJ also did not credit the opinions of those doctors who found that plaintiff's psychiatric condition did not limit her in any way because they too were contradicted by the objective medical record. She gave "little weight" to the consultative examiner Dr. T. Inman-Dudon's 2009 opinion that plaintiff had "mild social limitations" because there was evidence that plaintiff "consistently espoused paranoia and fear of her ex-husband for 5 years after she was initially assaulted" (Tr. 28). Rather, the ALJ gave "great weight" to this doctor's assessment that plaintiff could perform "entry level tasks in a low contact setting due to moderate psychological limitations" (Tr. 29). The latter opinion was "consistent with Bronx Lebanon Hospital records showing that by mid-2008 the claimant was discharged from treatment because her mood had improved, her mental state had stabilized and her anxiety had lessened" (Tr. 29, 541-44).

Finally, and consistent with the treatment records, the ALJ gave "some weight" to Dr. Duque's April 2013 medical source statement opinion that plaintiff had "little [or] no limitations in most related work activities" (Tr. 29). Dr. Duque's opinion was "consistent with a record showing that [plaintiff's] mental status examinations were essentially normal in 2008, 2009, 2010, 2012 and 2013, while [plaintiff's] mental state has been repeat-

edly assessed as stable and her anxiety symptoms were described as improved" (Tr. 29, <u>citing</u> 681-87). In a psychiatric medical report from March 2013, Dr. Duque described plaintiff as continuing to be symptomatic with a depressed mood but with "ok" attention, concentration, memory, information and ability to perform calculations and "good" insight and "fair" judgment (Tr. 684-85). Thus, the ALJ's mental RFC assessment correctly took into account the opinions of plaintiff's treating and consultative physicians where those opinions were supported by the objective medical record.

With respect to plaintiff's physical abilities, the ALJ gave "significant weight" to treating physician Dr. Carvajal's September 2010 opinion that plaintiff was "capable of light exertion with hearing and pulmonary limitations" (Tr. 28). The ALJ correctly noted that neither plaintiff's allergies nor her ear injury "prevented her from performing most physical-related activities" and there was "no evidence of asthma attacks or continued hearing loss due to a perforated ear drum" (Tr. 29, 353, 377, 389, 623-29). The ALJ's decision to give significant weight to this treating physician's opinion was thus supported by the treatment record.

Thus, the ALJ carefully summarized the medical evidence from numerous treating physicians, described plaintiff's physical

63

and psychiatric symptoms and progress and fairly assessed plaintiff's RFC based on those opinions that were supported by the substantial evidence in the record.

c.  Credibility Assessment

Based on a review of all the record evidence described above, the ALJ's conclusion that plaintiff's testimony was not entirely credible was also supported by substantial evidence.

The ALJ noted that plaintiff testified and made statements that she was unable to work due to post-traumatic flashbacks, limited socialization and severe concentration difficulties (Tr. 26, 812-13).  The ALJ found that although plaintiff's medically determinable impairments could reasonably be expected to cause these alleged symptoms, her statements about the intensity, persistence and limiting effect of those symptoms were not entirely credible (Tr. 26).

The ALJ correctly found that while plaintiff testified she could not work due to post-traumatic symptoms, the record showed that her physicians had assessed her mood as stable within months of her traumatic incident and that plaintiff herself reported that it was improving (Tr. 26, 544, 548, 560, 725).  The ALJ acknowledged that some of the medical records showed that plaintiff had severe limitations at times, (Tr. 375-76), but the

64

ALJ gave them little weight as later medical records showed that plaintiff's symptoms were in remission and her attention and concentration were consistently described as intact or normal (Tr. 26-27, 684, 697, 704, 707, 712, 722, 725, 730, 747, 758). Further, plaintiff testified at the hearing that she spent her days watching television, which requires attention and concentration (Tr. 27, 50, 60). Since her alleged onset date, plaintiff showed improvement in her anxiety and the majority of her GAF scores indicated mild or moderate limitations (Tr. 27, 560, 694, 699, 707, 709, 713, 718, 721, 727, 735, 741, 744).

The ALJ also found that inconsistencies in plaintiff's statements undermined her credibility. Although plaintiff expressed a fear of traveling, she visited family in Florida in late 2008 and in Georgia in 2009 (Tr. 27, 545-46, 725). In addition, although plaintiff testified that she can speak "a little" English, she earned her GED in the United States (Tr. 27, citing Tr. 644).

Thus, the ALJ's decision to disregard the plaintiff's testimony that her mental limitations were so disabling that she could not even do simple work was supported by the credible evidence in the record.

d.  <u>Summary</u>

Thus, in coming to her RFC assessment, the ALJ acknowl-edged the evidence in the record that supported plaintiff's mental limitations and appropriately balanced the conflicting evidence to reach the conclusion regarding plaintiff's limita-tions.  The ALJ determined that plaintiff could do light work but due to her mental impairments she was limited to the extent that she would have "no interaction with the public; occasional interaction co-workers; only occasional decision making or changes in the work setting" and that she would be "limited to simple, routine tasks" (Tr. 23).  This assessment was supported by treatment records showing that plaintiff had anxiety with dealing with the public but had a stable mood and was able to understand and complete simple tasks.

Further, with respect to plaintiff's physical impair-ments, the ALJ noted that plaintiff's treating physicians opined that she could perform "light work" with moderate postural, auditory and environmental limitations and that the treatment notes supported this conclusion (Tr. 27, 612-16, 623-29).  Thus, the ALJ's finding that plaintiff could perform light work with moderate pulmonary, auditory and environmental limitations was supported by substantial evidence.

66

                    3.  ALJ's Analysis at
                        Step Five:  Vocational Assessment

        The ALJ reasonably relied on the testimony of a voca-

tional expert and determined at step five that plaintiff was able

to perform other work in the national economy, considering her

age, education and work experience (Tr. 30-31).

        Because plaintiff had both exertional and

non-exertional limitations, the ALJ properly enlisted the assis-

tance of a vocational expert to assess what kind of work existed

in the national economy that plaintiff could perform.  The ALJ

posed a hypothetical to the expert to identify the jobs an

individual with plaintiff's RFC and vocational profile could

perform and the number of such jobs in the national economy (Tr.

74-79).  The ALJ's hypothetical to the vocational expert, as well

as the ALJ's decision at steps four and five, were based on RFC

assessments that, as detailed above, were supported by substan-

tial evidence.  As noted above, the vocational expert identified

three jobs in the national economy that plaintiff could perform

with these limitations (Tr. 75-79).  Thus, the vocational ex-

pert's testimony satisfied the Commissioner's burden of showing

the existence of alternative substantial gainful employment

suited to plaintiff's physical, mental and vocational capabili-

ties.  Accordingly, the ALJ correctly concluded that plaintiff was not disabled.

## IV.  Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that the Commissioner's motion for judgment on the pleadings be granted dismissing plaintiff's complaint.

## V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable George B. Daniels, United States District Judge, 500 Pearl Street, Room 1310, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, Room 1670, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Daniels.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d

68

Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049,

1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.

1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir.

1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983)

(per curiam).


Dated:   New York, New York
         December 29, 2016

                                   Respectfully submitted,


                                   _____
                                   HENRY PITMAN
                                   United States Magistrate Judge



Copies mailed to:

Ms. Ana L. Peguero
674 East 149th Street
Apt. 11M
Bronx, New York  10455

Copies transmitted to

Benjamin H. Torrance, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York  10007